**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DERREK E. ARRINGTON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES PARK POLICE SERVICE et al.,**<br><br>**Defendants.** | **Civil Action No. 01-1391 (CKK)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Derrek Arrington has sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, claiming that members of the U.S. Park Police assaulted and battered him in the course of his arrest on April 13, 2000.[1] Because the Court concludes, based on the facts set forth below, that the plaintiff has not shown by a preponderance of the evidence that the Park Police used excessive force in making the arrest, the Court will render judgment for the United States.

## I. FACTUAL BACKGROUND

The claims in this case arise from plaintiff's injuries sustained on April 13, 2000. The plaintiff was unable to appear at trial in person, so he appeared through a videotaped *de bene esse*

[1] Arrington also sued one member of the District of Columbia's Metropolitan Police Department, Sgt. Rick Murray. Because the claims against the two defendants arose from a single incident, there was one trial where the claims against Murray were tried to a jury and the claims against the United States were tried to the Court. The jury returned a verdict in favor of Sgt. Murray.

deposition taken about ten days before the trial began and played at trial. Much of what transpired is undisputed.

The Court has considered the testimony, pleadings, exhibits and entire record in this case, as well as observed the demeanor of the witnesses. The Court makes findings of fact as to that which is relevant to the claim and undisputed and/or uncontroverted by the parties. The Court also makes findings of fact as to that which is relevant and disputed.

*A. The Undisputed Relevant Evidence*

The Court credits the following findings of fact, which are not disputed or controverted. Sometime shortly after 2:30 a.m., two officers of the U.S. Park Police, Jonathan Daniels and Martin Yates, stopped plaintiff in his car for not displaying a front license plate.[2] Although the police officers did not know it at the time, the plaintiff had a loaded semi-automatic handgun concealed in his jacket pocket.[3] During the traffic stop, the officers noticed and then examined a small plastic "zip-lock" bag containing a powder residue which the officers suspected was cocaine.[4] When Daniels asked the plaintiff to step out of the car, the plaintiff refused and fled in

---

[2] Deposition *de bene esse* of Derrek E. Arrington, Nov. 21, 2008 ("Arrington") at 11:15-21, 43:10-12; Trial Transcript Dec. 2, 2008 ("Tr. Day 2") at 38:21 - 39:6, 42:19 (Yates). The name in parentheses at the end of the citations to the trial transcript identifies the person giving the testimony.

[3] Arrington at 38:2-17, 40:7-10.

[4] Tr. Day 2 at 44:6-14 (Yates). The plaintiff does not dispute that there were narcotics in the car, but testified under oath that he did not use drugs or alcohol on the night in question. *See* Arrington at 9:9-13 (denying using alcohol or any other drugs that night). This testimony is contradicted by statements the plaintiff made to two police officers and a nurse while he was being treated in the emergency room shortly after the incident. *See* Trial Transcript Dec. 3, 2008 ("Tr. Day 3") at 98:1-2 (Park Police Officer Eric Haapapuro testifying that the plaintiff told him that the plaintiff was addicted to crack cocaine and had been high on crack cocaine the night of the incident), 99:3-4 (Haapapuro testifying that the plaintiff blamed the incident on his addiction

his car.[5] Notifying the police dispatcher, the two officers gave chase in their police cruiser.[6] After traveling a few blocks, the plaintiff crashed his car and abandoned it.[7] He continued on foot, running down a narrow residential street, the loaded gun still in his jacket pocket.[8] An off-duty Metropolitan Police Department ("MPD") Officer, Sgt. Rick Murray, saw the car chase and the wreck, and joined in the pursuit.[9] A foot chase ensued, with Daniels, Yates, and Murray all running after the plaintiff.[10] In the back yard of a residential dwelling, the plaintiff tried to

---

to crack cocaine), 114:10 (Park Police detective Todd Reid testifying that plaintiff stated to him that plaintiff had smoked crack about a half an hour before he was pulled over by the police), 145:18-25 (Letitia Duah, RN, testifying as to United States' Ex. 28, the admission database information sheet she completed on the basis of responses from the plaintiff the afternoon following the night-time incident, which showed that plaintiff told Duah that he had used alcohol and drugs the night of the incident). Additionally, two small rocks of crack cocaine and a glass device for smoking cocaine base were recovered from the plaintiff's clothing taken from him in the hospital shortly after his arrest. *See* Day 3 at 116:7-20 (Reid). In light of the entire record, it is unnecessary to resolve this dispute of fact.

[5] Arrington at 13:16-22, 15:19 ("I fled the scene."), 45:12 - 46:9; Tr. Day 2 at 112:18 - 113:4 (Daniels).

[6] Tr. Day 2 at 113:5-8 (Daniels); United States' Ex. 16, Recorded Police Radio Transmission ("RPRT"). The radio transmission, which was potentially heard by all other Park Police officers involved in the apprehension of the plaintiff, also noted that Daniels had been "dragged down" by the fleeing car, and that there were narcotics in the vehicle. The plaintiff did not directly dispute that Daniels was dragged, but relayed a version of events that omits that Daniels was dragged, thus implicitly disputing the allegation. In light of the entire record, there is no need to resolve this credibility dispute.

[7] Arrington at 15:24 - 16:7.

[8] Arrington at 16:24 - 17:2, 17:24 - 18:1, 52:6-22.

[9] Tr. Day 2 at 19:20 - 20:8 (Murray).

[10] Tr. Day 3 at 22:6-23 (Murray); Tr. Day 2 at 47:11 - 48:1 (Yates).

catapult over a tall wooden fence, but a piece of the fence broke off and he fell back.[11] As he tried to leap the fence again, Daniels tackled him, causing the plaintiff's face to smash into the wooden fence.[12] Moments later Daniels was shot in the face with plaintiff's gun.[13]

Daniels believes he was standing when he was shot; Yates and Murray concur.[14] The bullet that hit Daniels entered through his cheek, just to the left of his nose and then fragmented; it is still lodged at the back of his head near his spine on his left side.[15] After a brief period at the beginning of the altercation when only Daniels, Murray and the plaintiff were together in the back yard (Yates had run into an adjacent yard to confront the plaintiff if he made it over the fence),[16] the plaintiff was face-down on the ground for the remainder of the incident.[17] Less than nine minutes elapsed from the time Daniels used the police radio to report the fleeing car until the end of the entire incident, and less than seven minutes elapsed from the time Daniels used the police radio to report that he had been shot until the end of the incident.[18]

---

[11] Arrington 19:2-7; *see also* United States' Ex. 13, a diagram to scale of the scene of the back yard incident and items of physical evidence collected from the crime scene, showing where the fence was broken and where the broken fence piece landed on the ground.

[12] Arrington at 19:8-17; Tr. Day 2 at 114:10-11 (Daniels).

[13] Tr. Day 2 at 114:10-22 (Daniels).

[14] Tr. Day 3 at 7:6-10 (Daniels); 26:4-21, 41:9-17 (Murray); Tr. Day 2 at 49:20-25 (Yates).

[15] Tr. Day 3 at 7:10-23 (Daniels).

[16] Tr. Day 2 at 39:19-22, 48:18 - 49:12 (Yates).

[17] Arrington at 23:10-12; Tr. Day 2 at 14:18-25 (Murray), 50:23-25 (Yates), 85:16 (Kidd), 72:23 - 73:2 (Peer), 115:9-11 (Daniels).

[18] RPRT.

An uninvolved eye-witness whose bedroom window overlooked the back yard where the incident occurred was awakened by loud voices from the back yard and "yelling 'Drop the gun. He has a gun. Give me the gun.'"[19] Before reaching his bedroom window to look out, he heard a gunshot,[20] and then looking out he saw what "looked like an outline of a male lying against the fence."[21] He also heard voices repeatedly saying "he's got a gun, drop the gun, get the gun."[22] When he saw the blue lights of a police cruiser approaching, concerned for his own safety, he turned away from the window and left the room, making no further observations.[23]

In the split seconds after the shooting, Murray identified himself to Yates as a police officer, adding that the plaintiff still had the gun.[24] In the next few minutes, Murray made several references to the gun, including telling the plaintiff to let go of the gun.[25] Yates heard Murray say "I feel the gun," "He has it in his hand," "He has the gun," "He's holding it," "I can't get to it," "He's got a grip on it."[26] Yates also repeatedly told the plaintiff to release the gun.[27] Minutes later, when the next two Park Police officers, Michael Peer and Russell Kidd, arrived on the

---

[19] Tr. Day 3 at 85:5-16, 87:21 - 88:3 (Louis Price).

[20] Tr. Day 3 at 85:18 - 86:1, 88:4-10 (Price).

[21] Tr. Day 3 at 86:16-17 (Price).

[22] Tr. Day 3 at 86:13-14 (Price).

[23] Tr. Day 3 at 86:19 - 87:3, 88:22 - 89:8 (Price).

[24] Tr. Day 2 at 50:21-25 (Yates).

[25] Tr. Day 3 at 29:10-12 (Murray).

[26] Tr. Day 2 at 51:17 - 52:4, 52:18-20 (Yates).

[27] Tr. Day 2 at 53:1-2 (Yates).

scene, they were warned by Murray that the plaintiff had a gun.[28] Kidd heard Murray "barking out what he was doing underneath, such as 'I have my hands on the gun, I'm pulling the trigger; the gun is pointing at you,' meaning me [Kidd]."[29] Kidd also repeatedly told the plaintiff to let go of the gun.[30] Soon after hearing a single gunshot,[31] MPD Sgt. Antonio Charland arrived on the scene at the same time Peer arrived with the police dog.[32] Upon arriving, Charland heard officers stating "He's got a gun. He's got the gun. I can't get it away."[33] He also heard others ordering the plaintiff to give up his gun.[34] Park Police District Supervisor Scott Fear also arrived at the scene after Daniels had been wounded, and heard officers yelling to warn him "He's got a gun. He's still got a gun. He's got a gun,"[35] and "Stay back, stay back, he's got a gun, he's got a gun."[36] The information that the plaintiff had a gun originated with MPD officer Murray and the Park Police officers in turn relied on that information.

---

[28] Tr. Day 2 82:8-9 (Kidd), 72:7-15, 74:14-20 (Peer).

[29] Tr. Day 2 at 84:3-7 (Kidd).

[30] Tr. Day 2 at 82:11-19 (Kidd).

[31] Tr. Day 3 at 48:21-22 (Charland).

[32] Tr. Day 3 at 49:2-9 (Charland).

[33] Tr. Day 3 at 51:19-22 (Charland).

[34] Tr. Day 3 at 59:223-25 (Charland).

[35] Tr. Day 3 at 131:10-12 (Fear).

[36] Tr. Day 3 at 134:2-3 (Fear); *see also* 132:7-12, 134:18-21; 140:1-9 (Fear stating that when he arrived on the scene, those involved were yelling warnings to him that the plaintiff still had control of the gun).

The police radio transmissions that night were recorded. That recording establishes that at some point after Daniels had reported that he had been shot in the face, Kidd transmitted his understanding, based on his assessment at the scene, that the plaintiff still "has a gun, he's on the ground, he's not giving it up at this time."[37] Still later, Fear[38] transmitted a caution to "Be advised we have numerous officers here and the subject still has the gun in his hand," a message repeated by the dispatcher.[39] Some time later, Kidd reported to the dispatcher that the weapon was secure and the suspect was in custody.[40] Despite the repeated references to the gun and commands to drop the gun, none of the officers heard the plaintiff deny having a gun or otherwise protest the operating premise that he had control of the gun.[41] The plaintiff did not dispute hearing references to the gun nor claim to have protested that he had no gun.[42]

MPD Sgt. Murray, being off-duty and dressed as a civilian, did not have any of his police equipment on his person.[43] Daniels had started the evening with two pairs of handcuffs, one of

---

[37] RPRT.

[38] Fear was the Rock Creek District's supervising sergeant that night, identified as Car 302 on the recorded radio transmissions. *See* Tr. Day 2 at 109:14 (Daniels establishing that District 3 is the Rock Creek District), 103:18 (Kidd establishing that 302 on the radio transmission is the District 3 supervisor); Tr. Day 3 at 131:5-10 (Fear, identifying himself as the sergeant in charge of Rock Creek District the night of the incident).

[39] RPRT.

[40] RPRT.

[41] Tr. Day 2 at 53:1-13 (Yates), 82:11-19 (Kidd), 116:5-7 (Daniels), Tr. Day 3 at 29:9 - 30:4 (Murray).

[42] Arrington at 25:4-15, 67:14-21 (testifying that he does not recall saying anything out loud during the incident).

[43] Tr. Day 2 at 18:18-22, 22:20-21 (Murray); Tr. Day 3 at 23:6-7 (Murray).

which was attached to the front of his belt and the other, in a case, attached to the back of his belt. Daniels lost the front pair of handcuffs at the scene of the traffic stop, where they were spotted a short time later by Yates[44] and subsequently collected from the crime scene by Sgt. John Gott of the Park Police Criminal Investigation Branch.[45] The second pair of handcuffs was recovered, still in the case, from the back of Daniels' gun belt as he was placed on the gurney to be taken to the awaiting ambulance.[46]

After the incident, the plaintiff's gun was recovered from the yard approximately 25 feet from the point at which the plaintiff had attempted to go over the fence.[47] Two expert firearms examiners independently subjected the plaintiff's gun to accidental discharge tests and both concluded that the plaintiff's gun could not be accidentally discharged.[48] Each also measured the trigger on plaintiff's gun at a ten-pound pull, requiring the equivalent pressure exerted by ten pounds of hanging weight, to make the gun fire.[49]

Each Park Police officer and MPD officer involved has conceded that he used force against the plaintiff during the back yard altercation, which cumulatively accounts for all plaintiff's injuries. Specifically, when Daniels tackled the plaintiff, plaintiff's face was smashed

---

[44] Tr. Day 2 at 56:15 - 57:2 (Yates).

[45] Tr. Day 3 at 70:12 - 72:15 (Gott).

[46] Tr. Day 2 at 117:15 - 118:1 (Daniels); Tr. Day 3 at 136:20 - 138:22 (Fear).

[47] *See* United States' Ex. 13, diagram showing where fence was broken, where fence piece was when collected, and where gun was when collected.

[48] Tr. Day 3 at 158:7 - 160:20 (Douglas Murphy); Trial Transcript Dec. 4, 2008 ("Tr. Day 4") at 79:1 - 80:9 (Lyndon Watkins).

[49] Tr. Day 3 at 160:21 - 161:10 (Murphy); Tr. Day 4 at 76:21 - 77:25 (Watkins).

into the fence, causing bruising, bleeding, and swelling to his nose and face.[50] Murray punched the plaintiff in the back rib/kidney area three or four times with a closed fist before the plaintiff was prone.[51] After the plaintiff was prone, Yates held a loaded gun directly against the plaintiff's head and cocked it, did not fire, but used it to strike the plaintiff on the top back of his head multiple times[52] leaving gashes that required stapling.[53] Peer, who responded to a call for assistance and arrived with his trained police dog after Daniels was shot and the plaintiff was on the ground and prone, first warned the plaintiff to let go of the gun[54] and, failing to gain compliance, then commanded the dog to bite and hold the plaintiff's right leg.[55] The dog bite and hold resulted in severe pain and deep wounds to the leg.[56] Kidd, who also responded to a call for assistance and arrived on the scene after Daniels was shot and the plaintiff was on the ground, used his asp baton to beat the prone plaintiff on the head.[57]

An expert in police use of excessive force testified that the Park Police has adopted a "use of force model" that was developed at the Federal Law Enforcement Training Center in 1989, is widely accepted in law-enforcement, and identifies five levels of threat which correspond to five

---

[50] Arrington at 19:10-17; Tr. Day 2 at 114:10-11 (Daniels).

[51] Tr. Day 2 at 14:14-17, 21:23 - 22:3, 24:2-4 (Murray); *accord* Arrington at 24:2 (mentioning a sore "rib area").

[52] Tr. Day 2 at 51:11 - 52:1 (Yates).

[53] Arrington at 28:6-8.

[54] Tr. Day 3 at 29:18 - 30:1 (Murray).

[55] Tr. Day 2 at 68:16 - 69:1, 70:19-23 (Peer).

[56] Arrington at 24:24 - 25:3, 28:4-5, 28:17-19.

[57] Tr. Day 2 at 82:7-10 (Kidd).

levels of use of reasonable force.[58] If the subject is compliant, then no force is warranted, but if a subject is passively resistant, use of minimal force, or "soft hands," is appropriate.[59] If a subject is more actively resistant, "hard hands," such as a wrist lock may be appropriate.[60] In these scenarios, the chance of injury to the officer or bystanders is minimal.[61] In situations where the subject poses injury to the officer or others, more force is appropriate to gain control of the situation. In a situation where a subject is assaultive, it may be appropriate to use an asp baton, pepper gas, or a trained dog, or to put the subject on the ground if he is standing.[62] Where the subject is assaultive and poses a risk of serious physical injury or death, then the officer is justified in using deadly force to manage the situation.[63] Any use of force commensurate with a threat less than that posed by the subject is justified and not excessive.[64] The expert's uncontroverted opinion was that because the plaintiff was fleeing, Daniels' use of "hard hands" in tackling him and throwing him against the fence was reasonable.[65] The expert concluded that after Daniels was shot, assuming the officers had an objectively reasonable belief that the plaintiff had a loaded gun, the use of deadly force would have been reasonable to gain control of

---

[58] Tr. Day 4 at 38:25 - 39:10, 40:5-7, 40:15-19 (Patrick Gallagher).

[59] Tr. Day 4 at 41:5-13, 43:16 (Gallagher).

[60] Tr. Day 4 at 41:14-23, 43:18-19 (Gallagher).

[61] Tr. Day 4 at 41:24 - 42:4 (Gallagher).

[62] Tr. Day 4 at 42:6-15, 43:7-9 (Gallagher).

[63] Tr. Day 4 at 42:16-21 (Gallagher).

[64] Tr. Day 4 at 42:21 - 43:7 (Gallagher).

[65] Tr. Day 4 at 45:1-13, 47:10 - 48:3 (Gallagher).

the plaintiff.[66] The expert also testified that it would not have been reasonable to use force against the plaintiff once he posed no threat of injury to the officers, no matter what the suspect had done before he ceased posing a threat.[67]

*B. The Disputed Testimony*

The plaintiff testified that as he was tackled from behind after failing to scale the fence, he released the weapon he had been carrying, never recovered it, and was immediately thrown to the ground face-down and handcuffed.[68] Plaintiff thought he was handcuffed by just one officer.[69] While he was prone and handcuffed, he saw and heard the gun fire and associated flash of light.[70] After the gunshot, while he was unarmed, prone, handcuffed, and "immobile,"[71] the police beat him and directed a police dog to bite his leg.[72] He did not see anyone get shot and has no explanation for how his gun shot Daniels,[73] or why the police stopped beating him when they

---

[66] Tr. Day 4 at 48:21 - 53:1, 61:17-23 (Gallagher).

[67] Tr. Day 4 at 61:24 - 63:18 (Gallagher).

[68] Arrington at 19:2-21, 20:3-24.

[69] Arrington at 21:7-8.

[70] Arrington at 21:9-15, 55:18 - 57:8.

[71] Arrington at 23:11.

[72] Arrington at 23:8 - 24:3, 26:16 - 27:11.

[73] Arrington at 21:21 - 22:21, *see also generally*, 21:9 - 22:21, 55:17 - 57:11.

did.[74] He heard someone refer to him as "a black piece of shit"[75] and, as he was being taken to an ambulance, he heard someone ask why he wasn't dead yet.[76]

The plaintiff's account is disputed in multiple respects by others' testimony. Park Police Officer Eric Haapapuro, who was assigned to guard the plaintiff in the emergency room the morning following the incident, testified that the plaintiff stated he had "wrestled over the gun" with an officer and "it just went off,"[77] a statement that the plaintiff never denied making. Both Yates and Murray testified that they saw the plaintiff's arm go up, followed by the muzzle flash of a gun. Murray saw Daniels slumped against the fence bleeding from his face, and Yates was aware that Daniels had stepped back at the time of the gunshot.[78]

Murray and Yates both reported that they laid on top of the plaintiff and struggled with him for control while Murray tried to disarm him.[79] The witness who looked out of his bedroom window just after hearing the shot testified that in addition to seeing a man slumped against the fence [Daniels], he saw "two Caucasian men [it is reasonable to infer that he saw Murray and Yates] struggling with, or trying to struggle with, an African-American man [the plaintiff]," before turning away when he saw the blue lights of a police cruiser arriving.[80] Murray and other

---

[74] Arrington at 25:16-23.

[75] Arrington at 25:4-10.

[76] Arrington at 27:12-23.

[77] Tr. Day 3 at 98:4-6 (Haapapuro).

[78] Tr. Day 2 at 22:11-16 (Murray), 49:24-25 (Yates).

[79] Tr. Day 2 at 50:16-25 (Yates); *see also* Tr. Day 3 at 31:4-5 (Murray testifying that the plaintiff was "continually fighting" with him and "I couldn't get the gun away from him.").

[80] Tr. Day 3 at 86:7-8 (Price).

officers testified that, at some point, Murray had his hands around the plaintiff in a bear-hug like fashion, with Murray's hands under the plaintiff's body and covering plaintiff's hands.[81] Peer testified that he saw the plaintiff struggling with Murray.[82] Charland testified that when he arrived on the scene, he saw officers struggling on the ground with the plaintiff.[83] Kidd testified that when he arrived, the plaintiff was face down on the ground, Murray was on his knees on the plaintiff's right side with his hands under the plaintiff's body, and Yates was directly on top of the plaintiff.[84] Fear, arriving after Charland, saw the "subject on the ground" with "numerous officers around the subject" and it looked "like the officers were trying to get the gun from the individual."[85] Daniels, too, testified that from his position against the fence after being wounded, he saw the plaintiff "fighting" with the other officers.[86]

Murray testified that before directing the dog to engage, Peer told the plaintiff to let go of the gun or he would engage the dog.[87] Peer testified that the plaintiff was not handcuffed when he ordered the dog to bite and hold, or even when he ordered the dog to release his bite.[88] Fear testified that he did not think the plaintiff was handcuffed when Fear arrived on the scene

---

[81] Tr. Day 3 at 28:25 - 29:7 (Murray); Tr. Day 2 at 23:5-6 (Murray), 72:14-22 (Peer), 115:3-11 (Daniels).

[82] Tr. Day 2 at 72:14-15 (Peer).

[83] Tr. Day 3 at 49:12-14, 51:19-25 (Charland).

[84] Tr. Day 2 at 79:14 - 80:7, 83:23-24, 84:3-4, 85:4-8 (Kidd).

[85] Tr. Day 3 at 131:8-12 (Fear).

[86] Tr. Day 2 at 116:6-12 (Daniels).

[87] Tr. Day 3 at 29:18 - 30:1 (Murray).

[88] Tr. Day 2 at 71:6-11 (Peer).

because he saw that the plaintiff's hands were underneath him and that the officers did not have control of the plaintiffs hands or arms.[89]

Murray testified that after struggling for what Murray estimated was ten minutes, Murray was able to wrest the gun away from the plaintiff.[90] Murray is not sure what caused the plaintiff finally to relinquish control.[91] When Murray got the gun, he got up, began to walk away, and "kind of "tossed dropped it [the gun] away from the plaintiff. I"m not sure how far. And then I [Murray] began to scream obscenities."[92] Kidd testified that when Murray got hold of the gun, he got up and gave a gutteral yell.[93] Yates testified that when Murray pulled the gun out from under the plaintiff, the plaintiff's arm came out with it, Murray flung the gun to the right and Yates was able to grab the plaintiff's right arm and pull it back.[94] Kidd and Yates both testified that together they handcuffed the plaintiff using Kidd's cuffs, and that the plaintiff had not been cuffed before that point.[95]

Murray, Yates, Peer and Kidd each deny using force on the plaintiff after he was disarmed and handcuffed, and each deny seeing anyone else do so.[96] Daniels also testified that he

---

[89] Tr. Day 3 at 136:7-11 (Fear).

[90] Tr. Day 3 at 30:14-24 (Murray).

[91] Tr. Day 3 at 30:14-19 (Murray).

[92] Tr. Day 3 at 31:6-9 (Murray).

[93] Tr. Day 3 at 84:14-17 (Kidd).

[94] Tr. Day 2 at 55:10-14 (Murray).

[95] Tr. Day 2 at 103:1-6 (Kidd), 55:13-25 (Yates).

[96] Tr. Day 2 at 23:15 - 24:9 (Murray), at 56:1-3, 57:8 - 58:5 (Yates), 70:24 - 71:23, 76:16-21 (Peer), 82:20 - 83:11, 83:16-19 (Kidd).

was not moved to the ambulance until after the plaintiff was in handcuffs and the situation stabilized, and that he did not see any officer strike the plaintiff after the plaintiff was handcuffed.[97]

## II. DISCUSSION

The parties do not dispute the applicable law in this case. In this civil suit for damages, the plaintiff, not the defendant, bears the twin burdens of production and proof by a preponderance of the evidence. The parties agree that the plaintiff's FTCA assault and battery claim is governed by District of Columbia law. They also agree that the controlling legal standard governing a claim against police officers for assault and battery is set forth in *Etheredge v. District of Columbia,* 635 A.2d 908 (D.C.1993). *See Arrington v. U.S.*, 473 F.3d 329, 335-36 (D.C. Cir. 2006). In short, "[a] police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary. Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." *Etheredge,* 635 A.2d at 916. Thus, to prevail on his claims for assault and battery, the plaintiff must show, by a preponderance of the evidence, that the officers from the Park Police used force beyond that "reasonably necessary to arrest a person and to keep the arrested person in custody."[98] To find the United States liable, the plaintiff must show that the Park

---

[97] Tr. Day 2 at 116:10 - 117:1 (Daniels).

[98] District of Columbia Standard Civil Jury Instruction No. 18.5 ("A law enforcement officer may use only that amount of force reasonably necessary to arrest a person and to keep the arrested person in custody. A person being arrested may not resist an arresting officer, even if the arrest is unlawful or lacks legal justification. An officer is not allowed to use force beyond that reasonably necessary to accomplish his lawful purpose.").

Police officers used greater force than was reasonably necessary under the circumstances. "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." *Graham v. Connor,* 490 U.S. 286, 397 (1989). The test for reasonableness "requires careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The expert opinion on what constitutes reasonably necessary force under various circumstances, *see supra,* is not contested by the parties.

*A. Findings of Disputed Facts*

The facts in dispute center on when the plaintiff relinquished his gun and was handcuffed. The plaintiff claims he was disarmed and handcuffed before the shooting, and the defendant claims it was six to seven minutes later. Related to this core dispute is the placement of plaintiff's hands and whether he was passively "immobile" while he was face-down on the ground, as plaintiff claims, or struggling, as the defendant claims.

Plaintiff maintains that he dropped his gun when he smashed into the fence, before Daniels was shot. He says that he was face down on the ground when he heard the noise and saw the flash of the gun. Circumstantial physical evidence does not support plaintiff's testimony. The gun was collected about 25 feet from where he was when said he dropped it, at the point he was tackled by Daniels while trying to go over the fence. Nothing in plaintiff's version of the events explains how the gun could be so far from where he said he dropped it. Plaintiff's testimony is also inconsistent with his own prior statement to Haapapuro, which he made shortly

after the incident and never repudiated, that the gun just went off while he was wrestling over it with a police officer. It is further inconsistent with the record of contemporaneous police radio transmissions that night, which reflects multiple references to the plaintiff not giving up the gun, and with the testimony from the uninvolved eye-witness who heard references to a gun and commands to "drop the gun." It is also inconsistent with the testimony of several officers, which was not directly disputed by the plaintiff, about references to the gun and commands to drop the gun or give it up. Most troubling, crediting plaintiff's version of events fails to explain why — as he was on the ground being beaten — he did not exclaim that he did not have the gun. The absence of any such denials or protests by plaintiff undermines his credibility regarding his contention that he did not have possession of the gun throughout the struggle.

The plaintiff also claims that he was handcuffed before Daniels was shot, and therefore could not have continued to hold the gun. This contention is undermined by circumstantial physical evidence in at least two respects. First, Daniels was the only officer on the scene with handcuffs at that time, and Daniels' handcuffs were not used. So, plaintiff's version of events does not explain whose the handcuffs were placed on him at the point he says he was handcuffed. Second, if plaintiff was handcuffed and therefore, as he contends, could not have pulled the trigger on his gun, and if his gun does not accidentally discharge and requires a ten-pound pull on the trigger to fire, as each of the firearms experts independently testified, then plaintiff's version of events affords no explanation as to how Daniels was shot. While it is not plaintiff's burden to explain how Daniels was shot, the fact that his version of events fails to account for the shooting makes plaintiff's version incredible.

Plaintiff not only claims that he was handcuffed, he maintains that he was "immobile" and prone while he was beaten gratuitously. If that were the case, Murray and Yates would have had no reason to lie on top of the plaintiff or to reach underneath his chest, positioning that multiple officers on the scene testified to witnessing, and that the plaintiff did not directly contradict. Testimony by several of the police officers directly contradicts plaintiff's claim that he was immobile. The uninvolved eye-witness corroborates the officers' testimony that there was a struggle. He testified to seeing two white men "struggling with or trying to struggle with" a black man. If the police had been gratuitously beating a prone and immobile person, as plaintiff contends, it is unlikely that the eye-witness would have described what he saw as a "struggle." The plaintiff's version of events is further undermined by his inability to explain why the beating stopped when it did, if he was not resisting at any time.

In light of the undisputed record evidence, crediting plaintiff's version of the facts would require the Court to discount physical evidence; to accept a version events that leaves unexplained the shooting and the plaintiff's failure to exclaim that he did not have the gun; to conclude that contemporaneous radio transmissions were either mistaken or fabricated; to conclude that all the officers — from two separate law enforcement agencies who arrived on the scene at different times and who did not all know each other, including the officers who processed the crime scene evidence after the fact — fabricated a story that they all maintained for more than eight years and then perjured themselves; and to conclude that the uninterested eye-witness was either confused or constructed his testimony to conform to the officers' version of the events. Accordingly, the Court credits the testimony of the police officers as set out in this memorandum opinion and does not credit defendant's verison of the facts. On this record, it

cannot be said that the plaintiff has proved his version of the disputed — and critical — facts by a preponderance of the evidence. Therefore, the Court makes the following specific findings as to the relevant disputed facts:

1. The plaintiff did not drop his loaded semi-automatic handgun before Daniels was shot.
2. The plaintiff was not handcuffed immediately upon being thrown to the ground and before Daniels was shot.
3. The plaintiff did not lie immobile and without resisting or struggling during the incident while police officers gratuitously beat him.

*B. Conclusions of Law*

Because the plaintiff failed to carry his burden of proof with respect to the disputed facts, the Court concludes as a matter of law, based on the facts the Court has credited, that the plaintiff has failed to establish the necessary factual predicate for proving his case of assault and battery against the U.S. Park Police in the course of his arrest on April 13, 2000. Accordingly, judgment will be entered for the defendant United States Park Police by separate order accompanying these findings of fact and conclusions of law.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

DATE: December 29, 2008